## No. 3941.

### SUMMERS & BRANNINS vs. J. S. CLARK.

If an importer of foreign goods has so gravely violated the revenue laws of the United States as to render the goods liable to confiscation, and himself obnoxious to the penalties of his act, prescribed by said laws, he will become liable to any innocent purchaser of those goods, for whatever sums the purchaser may have to pay the government, in order to compromise the suit to confiscate the goods; and for all necessary expenses incurred by such purchaser, in effecting the compromise. Such a compromise inures to the direct relief of the importer, which makes the latter liable for whatever the compromise has cost the former.

Where, by the terms of the United States revenue law, the penalty of its violation is the forfeiture of the goods without alternative, then the property in said goods vests at once in the government, and no purchaser of said goods, however innocent, can acquire any title to them. They remain liable to seizure and confiscation, wherever found.

APPEAL from the Sixth District Court, parish of Orleans. *Cooley, J.* *Labatt & Aroni* and *Hudson & Fearn,* for plaintiffs and appellants. *Billings & Hughes* and *William H. Hunt,* for defendant.

The opinion of the court, on the original hearing, was delivered by

MORGAN, J., on the rehearing by MARR, J., and the application for a second rehearing by MANNING, C. J.

Section fifty of the acts of 1799, approved second of March, (United States Statutes at Large p. 655) provides that if any goods brought in any ship or vessel, from any foreign port, shall be unladen, between the setting and the rising of the sun, except by special license from the collector of the port, the goods shall become forfeited.

Section three of the act approved sixth of August, 1846, provides that if any warehoused goods shall be fraudulently concealed in or removed from any public or private warehouse, the same shall be forfeited to the United States.

Section four of the act of eighteenth of July, 1866, provides that if any person shall *fraudulently* or *knowingly* import, or shall *receive*, conceal, buy, sell, or in any manner facilitate the transportation, concealment, or sale of such goods, *knowing the same to have been imported* contrary to law, such goods shall be forfeited.

On the twenty-fourth of May, 1869, the collector of the port of Louisville seized 1089 barrels and 254 packages of sugar as having been brought into the United States in contravention of the laws above quoted, and the United States attorney libeled the same, and asked for the condemnation of the property. In whose hands the sugars were seized does not appear.

Plaintiffs, who reside in Louisville, aver that the sugars in question were shipped to them by H. N. Soria & Co., of New Orleans, and that they were sold by them (plaintiffs.) That the sugars were for a long time in danger of being confiscated; that the persons to whom they had sold them, and in whose possession they were when seized, were innocent vendees, and that they (plaintiffs) were bound to "stand by them" and protect them from loss, which they did. They aver that after great exertions they succeeded in effecting a compromise with the government, to accomplish which they were obliged to pay, and did pay, in duties, costs, expenses, and charges, $11,041 41.

They then aver that H. N. Soria & Co. were merely the agents of James S. Clark, the defendant, who, they allege, was the real owner of the sugars, and that he merely used Soria & Co. to carry out his designs. They aver that if they had not compromised with the government the sugars would have been confiscated. They say that they deemed it in the best interest of all parties to make the compromise, and that, as *negotiorum gestores*, they did so. They pray for judgment against the defendant in the sum claimed, as above set forth.

The action, therefore, is one instituted by a *negotiorum gestor* for the reimbursement of money spent by him in the interest of his principal. Primarily, whose interests were the plaintiffs protecting when they made

the alleged compromise? Evidently, the parties in whose hands the sugar was seized, for it was their property, and it was they who were in danger of loss.

Whose interest did they represent, in the second place? Their own, because they allege that if the sugars had been condemned they would have been obliged to make good the loss to the holders thereof, their vendees.

But they say that Clark committed the fraud; that Clark shipped the sugars to them; that they sold them to third parties; that without the compromise the sugars would have been condemned, in which event they, innocent venders, would have had to shoulder the burden of their innnocent vendees, and that Clark who perpetrated the alleged fraud upon the government and procured them to pass off the property is bound to reimburse them what they paid to prevent the loss attaching to their vendees.

A *negotiorum gestor* is one who spontaneously and without authority undertakes to act for another during his absence in his affairs. Bouvier's Law Dictionary, vol. 2, p 170. His agency springs from an emergency, and his action is taken on the spur of the moment. The action must be intended to benefit the person in whose favor the action is taken, and must benefit him. In this event he is responsible for the expenses incurred by his self-constituted agent. Now the plaintiffs were not the agents of Clark when the compromise was effected. The compromise was not effected in his name. Their connection with Clark ceased when they disposed of the sugar shipped by Soria & Co. to them, assuming Clark to have been the owner thereof, and their returns thereof had been made and acknowledged. If they acted for him in regard to the compromise it was not because of any contract between them, or from any obligation under which they rested, but it was in what they supposed to be the interest of the defendant.

The plaintiffs reside, as we have seen, in Louisville. The defendant resides in New Orleans. Between the two cities there is rapid communication by rail, and almost instantaneous communication by telegraph. When the sugars were seized by the government, communication between the two places was not interrupted. Some ten months intervened between the date of the seizure of the sugars and the compromise, and although it appears that one of the plaintiffs was once in this city, and although they had sent counsel here from Louisville to examine into the facts upon which the libel was based, no demand whatever was made upon Clark, and no call was made upon him to defend the suits or procure the release of the property libeled. The compromise, therefore, was the voluntary act of the plaintiffs, and made without reference to Clark. They certainly had no power to spend his money in that way without his

consent, when they could have notified him of the danger he was in, and at least called upon him to protect himself and them.

Judgment affirmed.

TALIAFERRO, J. For the reasons above stated, and others, I concur in the decree.

Justices Howell and Wyly reserve the right to file dissenting opinions.

---

ON REHEARING.

About the month of October, 1868, an arrangement was made between James S. Clark and H. N. Soria & Co., of New Orleans, for the importation of Havana sugars, to be purchased by Clark and consigned to Soria & Co. for his account. Soria & Co. were to provide a bonded warehouse, or, as Soria expresses it, "a bonded warehouse was to be *fixed up*," at New Orleans, in which the sugars were to be stored, subject to such disposition as Clark might indicate, and Soria & Co. were to be paid a commission of one dollar per box.

.Clark went to Havana and purchased the first lot of sugar, and thus. inaugurated the business. This and all the subsequent purchases were made with means furnished by Clark, and Soria & Co. were interested only to the extent of their commission.

Soria & Co. obtained the necessary authority, and became the proprietors of and opened the warehouse, and the sugars, as they arrived from Havana, were received by them, the consignees, and· were stored in this warehouse.

In the latter part of 1868, or early in 1869, Clark sought an introduction to Edwin H. Summers, of the firm of Summers & Brannins, and opened negotiations for advances on Havana sugars, to be shipped by Soria & Co. E. H. Summers, A. O. Brannin, and John S. Brannin composed the New Orleans firm of Summers & Brannins, and they were also partners, factors, and commission merchants, under the style of Brannin, Summers & Co., at Louisville, Kentucky, where the Brannins resided. Summers informed Clark that his New Orleans firm would make proper advances on consignments to the Louisville firm.

Shortly after this interview, Soria, by direction of Clark, called on Summers & Brannins, and the negotiations were completed. Sundry shipments of sugars were made by Soria & Co. to Brannin, Summers & Co., on which large advances were made by Summers & Brannins, covered by six drafts of Soria & Co. on Brannin, Summers & Co., of different dates, from the fifteenth of February to the eighth of March inclusive, aggregating seventy-three thousand five hundred dollars, maturing at different periods, the latest on the sixth of May, 1869.

The demand for these sugars was not very active, and some time in April, Soria, by direction of Clark, went to Louisville and instructed Brannin, Summers & Co. to have them transferred from the boxes, the original packages, into barrels, for the reason, as stated by him to Brannin, Summers & Co., that "the goods would be more salable in that shape than in boxes." He testifies, however, that the real object which Clark had in view in ordering this change was "*to prevent identification.*"

The sugars remaining on hand at the time this change was made were sold by Brannin, Summers & Co.; and soon after, before they had been paid for, on the twenty-fourth of May, 1869, they were seized in the hands of the several purchasers, and were proceeded against by the government, in six separate suits, in the United States District Court at Louisville for condemnation and forfeiture under the revenue laws.

Brannin, Summers & Co., who, according to the testimony, had no suspicion of any fraud or irregularity, either in the importation or the subsequent shipments to them, were alarmed at these seizures, which threatened heavy pecuniary loss to them, and serious impeachment of their reputation as merchants. They employed eminent counsel, who undertook the defense, and procured the release of the seizures on bond.

On the first of June John K. Goodloe, one of the counsel thus employed, left Louisville for New Orleans in company with John S. Brannin, to ascertain the history of the alleged frauds and causes of forfeiture. The information which they obtained, after thorough investigation and examination of the records at the Custom-House, satisfied Mr. Goodloe, a lawyer of large experience, "that the government had in its possession evidence sufficient to insure a condemnation and forfeiture of all the sugars seized at Louisville," as he testifies.

Soon after the seizures were made Summers, having ascertained that the duties had not been properly paid, had an interview with Clark, in which he told Clark he believed that he, Clark, was connected with this matter, and that he would hold him personally responsible. Clark denied having any connection with it, except that Soria owed him money.

A. O. Brannin also visited New Orleans in reference to these seizures, and having been informed by Soria that Clark was the owner of the sugars, he called on him. The result of this interview is not stated, but it is evident that Soria & Co. and Clark were aware of the proceedings at Louisville which involved such serious consequences to them.

On the return of Mr. Goodloe to Louisville, upon his statement of the facts ascertained by him at New Orleans, the two legal firms employed by Brannin, Summers & Co. were satisfied that the government would be able to make out a clear case of forfeiture, and they advised that an application for a compromise and remission of the forfeiture should be made at once to the Secretary of the Treasury. The application was

made, and the compromise was recommended by the District Attorney, B. H. Bristow, and by the surveyor of the port of Louisville, both of whom knew the reputation of Brannin, Summers & Co., and were convinced of their entire innocence of the alleged fraud upon the government.

The Secretary of the Treasury did not act promptly on this application, and Mr. Goodloe went to Washington to urge it in person. Finally, in January, 1870, after much trouble and expense, and upon the personal representations of Mr. Goodloe and Mr. Bristow, who was at Washington at that time, the forfeiture was remitted, and the District Attorney who had succeeded Mr. Bristow was instructed to dismiss the proceedings on payment of the duties at three cents a pound and all fees and costs. These terms were promptly complied with, and on the twenty-first of January, 1870, the suits were dismissed.

Mr. Goodloe testifies that this was the most favorable settlement that could have been obtained, and that the sugars, if tested by the government standard, would have been subject to a higher duty. He attributes this result as much to the high character, social and commercial, of the members of the firm of Brannin, Summers & Co. as to the efforts of themselves and their counsel.

Brannin, Summers & Co. made up their account with their consignors, Soria & Co., in which they charge all the advances made, duties, costs, fees, and expenses paid, and credit the proceeds of all the sugars, showing balance due by Soria & Co., twenty-seventh of January, 1870, $11,041 41. This account was presented to Soria & Co. by Summers & Brannins, and it was acknowledged to be correct and satisfactory by Soria & Co. in writing at the foot of the account. Brannin, Summers & Co. charged this balance to Summers & Brannins, and this suit was brought against Clark to recover that balance, $11,041 41, with five per cent interest from the twenty-seventh of January, 1870.

The petition charges that Clark was the owner of the sugars, the real party in interest; that Soria & Co. were merely his agents; that he suppressed his name as principal for purposes of his own, and used the name of Soria & Co. to carry out his designs; that the government claimed that the sugars had been fraudulently introduced through the Custom-House at New Orleans from Havana, and were actually seized at Louisville, in the hands of innocent vendees, and that they were for a long time in jeopardy of actual confiscation.

The petition states the good faith and the innocence of the plaintiffs; their efforts to save the sugars from forfeiture; the expenses incurred and paid by them; the beneficial results to Clark, and his obligation to reimburse them as *negotiorum gestores*.

Clark answered on the thirtieth of March, 1870, simply pleading a gen-

eral denial. The trial commenced in the lower court on the seventeenth of December, 1870, and the case was finally submitted on briefs on the twenty-third of December, 1871, and on the twenty-eighth of February, 1872, for reasons orally assigned, "the law and evidence being in favor of defendant," judgment of nonsuit was entered, from which the plaintiffs appealed.

Summers died pending the appeal, and his widow and administratrix was made a party in this court. Our predecessors, on the twenty-third of May, 1876, affirmed the judgment of the court below, and the case is before us on the rehearing granted by them.

We do not find in the pleading, nor in the several printed arguments filed by counsel for the appellee, that he raises any question as to the ownership of the sugars; nor do we think that he could have done so successfully. Soria testifies that Clark was the only person known to him as the owner, and that he paid Clark all the money advanced on the sugars, and all that was received from proceeds of sales. There is no room for doubt as to Clark's ownership, and his failure to testify in his own behalf, and to offer any testimony to contradict that of Soria, relieves us of the necessity of further inquiry as to his relations to these sugars.

The counsel for appellee rest the case upon the law. They maintain that the sugars were not liable to forfeiture; that Brannin, Summers & Co. were bound to have defended the suits in which the sugars were seized; that they did not give Clark proper notice of the seizures, and that if they were in good faith their innocence would have protected them and their innocent vendees, and there would have been no difficulty in obtaining a full remission of all penalties and expenses. "But they threw away this opportunity, and preferred to make the compromise."

"If, on the other hand," counsel argue, "appellants were implicated in the fraud, then the compromise was useful and necessary, and highly advantageous to themselves." "But they are not permitted to claim a contribution from their confederates. *Ex turpi causâ non oritur actis.*"

We do not find in the record the slightest foundation for the application of the maxim *ex turpi causâ.* On the contrary, the good faith of appellants is not only not impeached by any testimony in the record, but it is, moreover, fully shown by the testimony of A. O. Brannin, E. H. Summers, John K. Goodloe, and B. H. Bristow ; and the appellee has had the full benefit of the entire innocence of the appellants in the favorable compromise by which the sugars were saved from forfeiture.

It is not the habit of the Secretary of the Treasury to remit forfeitures after condemnation, and the chances of a favorable compromise, in any case, are greatly diminished by a judgment after a protracted litigation.

As to notice to Clark, the proof is positive that he was informed by Summers of the seizures soon after they were made, and when Summers told him he would be held responsible he denied having any connection with the sugars. Certainly he can not be heard to complain of want of notice after this.

Within less than ten days after the seizures John K. Goodloe and John S. Brannin came to New Orleans for the special purpose of obtaining information about these sugars with a view to the defense of the suits, and they spent a week in this investigation, which was minute, the collector giving them access to the records of the Custom-House. Summers assisted them, and it can not be that they failed to call upon Soria & Co., the shippers of the sugars, and Clark, who had opened the negotiations with Summers. Soria & Co. and Clark must have known of the mission of Goodloe and Brannin, and they could not have been ignorant of the peril to which the sugars were exposed.

With every opportunity afforded him by a singularly protracted trial, Clark did not offer any testimony tending to exonerate him from liability in the present suit, and the presumption is that if any fact had existed which would have shown that the sugars were not liable to condemnation he would not have failed to plead and prove that fact in the present suit, with so much the better reason and greater effect if no opportunity had been offered him to make the same proof in the proceedings at Louisville.

The real questions to be determined in this case are :

First—Were these sugars liable to condemnation and forfeiture in the hands of the innocent purchasers ?

Second—Was Clark benefited by the compromise effected by Brannin, Summers & Co ?

First—The libels under which the seizures were made contain four counts, charging: 1. Violation of section fifty of the act of Congress approved second of March, 1799. 2. Violation of section four of the act approved eighteenth of July, 1866. 3 and 4. Violation of the act approved sixth of August, 1846, section three.

Section fifty of the act of 1799 prohibits the unlading of any imported goods between the setting and the rising of the sun without a special license from the collector and the naval officer of the port; and it also forbids the unlading of such goods at any time without a permit from the same officers, under penalty, in both cases, of forfeiture of the goods. To obtain a permit, the goods must first be entered at the Custom-House, and the duties paid, or secured to be paid.

Section four of the act of 1866 subjects to the penalty of forfeiture goods fraudulently or knowingly imported or brought into the United States contrary to law, and this penalty is wholly independent of the fine

and imprisonment imposed upon the guilty parties, their aiders and abettors, on conviction.

Section three of the act of 1846, known as the warehousing act, relates to the fraudulent concealment in, and the fraudulent removal from, any public or private warehouse, of any warehoused goods, under penalty of forfeiture of the goods; and the guilty parties are also subject to criminal prosecution, and to fine and imprisonment on conviction.

Soria testifies that there were seven hundred and fifty boxes of these sugars per De Sota, which arrived from Havana on the twenty-seventh of January, 1869, of which five hundred boxes were shipped to Brannin, Summers & Co. "There was no entry made of the seven hundred and fifty boxes at the Custom-House." How easy it would have been to disprove this statement by the records of the Custom-House if it were not true.

Another lot, two hundred and seventy boxes, per Santiago de Cuba, shipped to Louisville thirteenth of February, 1869, of which Soria says, "No entry was made at the Custom-House that I know of." As Soria & Co. were the consignees, and had the invoices and bills of lading, they were the proper persons to make the entry, and Soria would have known if the entry had been made.

There were twenty-one hundred and fifty boxes per Ida M. Conery which arrived first of March, and on the same day Soria & Co. gave a warehousing bond for this lot. On the second of March one thousand boxes of the twenty-one hundred and fifty were shipped by Soria & Co. to Louisville "before the permit was granted," as Soria testifies. On the third of March one Sheldon gave a bond for the transportation of the whole twenty-one hundred and fifty boxes to Cincinnati, and on the fifth of March permit was given for the delivery of these twenty-one hundred and fifty boxes for transportation to Cincinnati.

The transportation bond was canceled, when or how it does not appear, but it was conditioned for the delivery to the collector at Cincinnati, and the entry there for rewarehousing, and it should not have been canceled until compliance with the condition had been properly proven.

Soria says these sugars went into his bonded warehouse, and that all the sugars shipped by Soria & Co. to Louisville were taken from this warehouse. Two importations, seven hundred and fifty and two hundred and seventy, in all one thousand and twenty boxes, were not entered at the Custom-House, and one thousand boxes were shipped before the permit was granted, and that permit was granted on the fifth of March, for twenty-one hundred and fifty boxes for transportation to Cincinnati, when one thousand of the boxes were on their way to another port, Louisville, having been shipped three days before the date of the

permit, consigned to Brannin, Summers & Co.; just as if the duties had been fully paid at New Orleans.

Soria says: "Mr. Clark ordered me when, where, and to whom to ship. I gave these orders to the drayman, who went there, and they were delivered by the man who was in charge of the bonded warehouse, and shipped in accordance with these instructions."

The testimony of Soria, in no way contradicted, is confirmed by Clark's failure to testify, and fully warrants the conclusion that Clark purchased these sugars at Havana with the intention to import them into the United States and to put them on the market without paying the duties, and that the consigning them to Soria & Co., and the *fixing up* of the bonded warehouse, to be kept and controlled by Soria & Co., were but the means and instrumentality, prearranged, by which this design was intended to be, and was, in fact, accomplished. It is difficult to conceive of any defenses which could have been made to the suits brought by the government for the condemnation and forfeiture of these sugars.

The counsel for appellee have failed to observe an obvious distinction, and they are mistaken in asserting that the innocent purchasers could have protected themselves against the proceedings by the government for the condemnation and forfeiture of these sugars by proving their innocence.

Where, by the terms of the law, the penalty is in the alternative, the forfeiture of the goods or *of the value thereof;* the title to the goods does not vest in the government until it has elected whether to proceed for the goods or for the value thereof. Any purchaser in good faith between the time of the committing of the offense and the election by the government would acquire a good title to the goods, and the government would be compelled to take the alternative, and to proceed against the offender, the owner or agent or consignee, for the value.

Where, by the terms of the law, the penalty is the forfeiture of the goods, without alternative, as in section fifty of the act of 1799, section three of the act of 1846, and section four of the act of 1866, under which these sugars were seized, the title vests in the government from the moment the offense is committed, and no adverse title can be acquired by any one, nor can any right accrue to any person whomsoever, after the commission of the offense, by which the title of the government, and the right to seize the goods, wherever they may be found, and to have them condemned and forfeited, can be in any manner affected or impaired.

This distinction is plainly laid down in Caldwell's case, 8 Howard, and in Henderson's case, 14 Wallace. The United States vs. Grundy, 3 Cranch, is an example under the registry act of thirty-first of December, 1792, section four, in which the penalty for false swearing in registering a

vessel is the forfeiture of the vessel or the value thereof. . And the United States vs. Certain Bags of Coffee, 8 Cranch, and Gelstur vs. Hoyt, 3 Wheaton, are examples under statutes in which the penalty is forfeit- ure, in the one case of the goods, in the other case of the vessel.

It is not material to determine whether the facts proven in this case bring it within section fifty of the act, of 1799, or within section three of the act of 1846, or within section four of the act of 1866. We entertain no doubt that the offenses mentioned in these three sections were com- mitted. A permit requires a previous entry, and as no entry was made of one thousand and twenty boxes of the imported sugars, they must have been unladen without a permit, and thus have incurred the penalty of forfeiture under the act of 1799.

The proof satisfies us that these sugars were purchased and brought into the United States with the intention to evade the payment of the duties, and that they were subject to forfeiture under the act of 1866.

It is plainly proven that these sugars were fraudulently removed from the bonded warehouse of Soria & Co. by direction of Clark, the owner, through the agency of Soria & Co., the consignees, in accordance with the plan pre-arranged; and the penalty of forfeiture under the act of 1846 had been incurred beyond doubt or question, as we think.

It is not necessary to pursue this branch of the subject further. The story told in this record is one of systematized fraud upon the revenue, which could not have been practiced on so large a scale and with such success without the guilty connivance and complicity of some of the officers of the government charged with the collection of the customs at New Orleans.

Counsel for appellee argue that the act of August 6, 1846, is supplied and repealed by the act of the eighteenth of July, 1866. We do not think so. The act of 1846, section three, relates to the fraudulent con- cealing in, or the fraudulent removal from, any public or private ware- house of any warehoused goods; while section four of the act of 1866 relates to the fraudulent importation of goods. Goods may be imported fairly and legally, so that there could be no pretense of a violation of section four of the act of 1866 ; and the same goods might be afterward fraudulently concealed in, or fraudulently removed from, the public or private warehouse in which they were stored in bond, and the penalty of forfeiture, under the act of 1846, section three, might be incurred without the violation, up to the time of such fraudulent concealment or fraud- ulent removal, of any other statute of the United States.

Besides, we find section fifty of the act of 1799, section three of the act of 1846, and section four of the act of 1866, re-enacted in the Revised Statutes of the United States, sections 2867, 2872, 2873, 2987, and 3082.

If either Clark or Soria knew any fact, knew of any means, by which

the sugars could have been saved from forfeiture, it was their duty, and they had ample time and opportunity, to have given the information to the parties at Louisville, or, at least, to have communicated the facts and means of defense to Summers & Brannins, who had advanced on the sugars beyond their value, deducting the duties. When Summers charged Clark with responsibility, instead of furnishing the means to defeat the claim of the government Clark denied having any connection with the business, except that Soria owed him money, while Soria testified that Clark was indebted to him.

It is too plain to admit of question that there was no fact or circumstance known to Clark or to Soria which would have been available against the claim of the government for the absolute forfeiture of these sugars, and neither Clark nor Soria made any attempt to relieve the purchasers, or gave any assistance to Brannin, Summers & Co., who stood between them and the purchasers.

These sugars were not merely in jeopardy, they were clearly liable to forfeiture; and the innocence of Brannin, Summers & Co., and of the purchasers from them, would have afforded no protection against the right and claim of the government.

Second—If the sugars had been condemned, the purchasers would have had recourse, immediately, on Brannin, Summers & Co., and they, in turn, would have been entitled to recover their disbursements and expenses from Clark, the owner of the sugars.

In Meredith vs. the United States, 13 Peters, 494, it was decided that the duties on imported goods constitute a personal debt and charge upon the importer, as well as a charge upon the goods. The amount of duties paid by Brannin, Summers & Co. on the sugars seized was $8593 62 in gold, equal, at the time the payment was made, to $10,484 22 in currency. Neither innocence nor any other circumstance would induce or authorize the Secretary of the Treasury to abandon the right of the government to be paid the full duties on imported goods, and as Clark was bound, at any rate, to pay the duties, he was benefited to that extent, at least, by the payment made by Brannin, Summers & Co.

We are not satisfied that the relations of Brannin, Summers & Co., as factors and agents to Clark, the owner of the sugars consigned to them for sale, had ceased when the seizures were made; but we do not care to inquire whether their agency still continued, or whether it had terminated, and they are to be regarded in all that they did with respect to the sugars after the seizures as *negotiorum gestores*. It is a principle of law and of right that no one shall enrich himself at the expense of another. Brannin, Summers & Co., at great expense of time and money, saved Clark from the consequences of the condemnation of property worth more than five times as much as they claim of him; and it

would be an outrage upon justice to allow Clark to enjoy all the benefits of the outlay of money and of the services of Brannin, Summers & Co., occasioned solely by his violation of the revenue laws, without any obligation on his part to reimburse them.

The account sued on was acknowledged and approved by Soria, who, with respect to this entire business, was the *alter ego* of Clark, and it is sufficiently proven by other testimony in the record. We are satisfied that Clark is bound, legally, and *ex aequo et bono,* for the full amount sued for ; and that appellants are entitled to judgment as prayed for in their petition.

It is therefore ordered, adjudged, and decreed that the decree rendered herein by our predecessors on the twenty-third of May, 1876, be set aside and avoided ; that the judgment of the Sixth District Court appealed from be also avoided and reversed ; and, proceeding to render such judgment as the court *a qua* should have rendered, it is further ordered, adjudged, and decreed that Summers & Brannins, plaintiffs and appellants, now represented by Mrs. S. S. Summers, widow and administratrix of Edwin H. Summers, deceased, Abram O. Brannin, and John S. Brannin, do have and recover of and from James S. Clark, defendant and appellee, the sum of $11,041 41, with interest at the rate of five per cent per annum from the twenty-seventh of January, 1870, until paid, and costs in both courts.

---

### For a Second Rehearing.

Manning, C. J. An opinion was read and judgment rendered in this cause last year. Upon application for a rehearing it was granted, and a second judgment was rendered. This is an application for another rehearing. We have said in the "succession of Milton Taylor," wherein a similar petition was presented, that it is an innovation upon the established practice of this court, and is not warranted by the Code of Practice. For that and other reasons this day assigned in rejecting the application in that cause, the prayer in this suit is refused and denied.